**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

SCHELLA HOPE,

    Petitioner,

v.

UNITED STATES OF AMERICA,

    Respondent.

CIVIL ACTION NO.: 2:15-cv-169

(Case No.: 2:13-cr-16)

## **ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Schella Hope ("Hope"), who is currently housed at the Federal Medical Center-Carswell in Fort Worth, Texas, filed a Motion to Vacate, Set Aside, or Correct her Sentence pursuant to 28 U.S.C. § 2255. (Doc. 1.) Respondent filed a Response, and Hope filed a Reply. (Docs. 6, 7.) For the reasons which follow, I **RECOMMEND** the Court **DENY** Hope's Section 2255 Motion, **DIRECT** the Clerk of Court to **CLOSE** this case, and **DENY** Hope a Certificate of Appealability and *in forma pauperis* status on appeal.

## **BACKGROUND**

Hope was charged in this District by Indictment of: conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count One); health care fraud, in violation of 18 U.S.C. §§ 1347 and 2 (Counts Two through Twenty); and aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2 (Counts Twenty-one through Thirty-nine and Counts Forty through Forty-five). Indictment, United States v. Hope, 2:13-cr-16 (Apr. 3, 2013), ECF No. 1. The Court appointed John Wetzler to represent Hope. CJA 20, United States v. Hope, 2:13-cr-16 (Apr. 22, 2013), ECF No. 19. However, Thomas Withers entered a limited appearance on

Hope's behalf the next day because Hope was making arrangements to retain Mr. Withers as her counsel. Notice, United States v. Hope, 2:13-cr-16 (Apr. 23, 2013), ECF No. 20. On this same date, the Court terminated Mr. Wetzler as Hope's counsel. Hope had her initial appearance before United States Magistrate Judge James E. Graham, at which time he informed Hope that she had until April 29, 2013, to retain Mr. Withers or other counsel or the Court would appoint an attorney to represent her. Min. Entry, United States v. Hope, 2:13-cr-16 (Apr. 23, 2013), ECF No. 21. Subsequently, Mr. Withers moved to withdraw as Hope's attorney based on her failure to contact him in a week's time. Judge Graham granted this motion after conducting a hearing and reappointed Mr. Wetzler to represent Hope. Order, United States v. Hope, 2:16-cr-16 (S.D. Ga. May 16, 2013), ECF No. 45.

Hope was later charged in a Superseding Indictment of: conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1347 (Count One); healthcare fraud, in violation of 18 U.S.C. §§ 1347 and 2 (Counts Two through Seventeen); aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2 (Counts Eighteen through Thirty-three and Counts Thirty-four through Thirty-nine); money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2; and money laundering transactions over $10,000, in violation of 18 U.S.C. §§ 1957 and 2 (Counts Fifty-four through Fifty-nine).[1] Superseding Indictment, United States v. Hope, 2:13-cr-16 (S.D. Ga. Sept. 11, 2013), ECF No. 79. After a five-day trial, a jury convicted Hope on all Counts of the Superseding Indictment. Jury Verdict, United States v. Hope, 2:13-cr-16 (S.D. Ga. Nov. 8, 2013), ECF No. 112. Mr. Wetzler moved to withdraw as Hope's attorney before sentencing, and the Court granted the motion after conducting a hearing, specifically finding that "the trust necessary for a meaningful attorney-client relationship has eroded." Order, United States v.

---

[1] Chief Judge Lisa Godbey Wood dismissed Count Fifty-five of the Superseding Indictment without prejudice upon the Government's Motion. Order, United States v. Hope, 2:13-cr-16 (S.D. Ga. Nov. 4, 2013), ECF No. 97.

Hope, 2:13-cr-16 (S.D. Ga. Dec. 10, 2013), ECF No. 128. The Court then appointed Amy Lee Copeland to represent Hope. CJA 20, United States v. Hope, 2:13-cr-16 (S.D. Ga. Dec. 11, 2013), ECF No. 129. Chief Judge Lisa Godbey Wood sentenced Hope to 192 months' imprisonment, which was comprised of concurrent 116-month terms of imprisonment as to Counts 40 through 53; concurrent 52-month terms of imprisonment as to Counts 1 through 17, Count 54, and Counts 56 through 59, each to be served consecutively to Counts 40 through 53; and concurrent 24-month terms of imprisonment as to Counts 18 through 39, each to be served consecutively to Counts 1 through 17, Count 54, and Counts 56 through 59. Chief Judge Wood ordered Hope to pay restitution in the amount of $4,364,369.13. J., United States v. Hope, 2:13-cr-16 (S.D. Ga. May 21, 2014), ECF No. 170, pp. 2, 5. Hope filed a timely Notice of Appeal. Notice, United States v. Hope, 2:13-cr-16 (S.D. Ga. June 3, 2014), ECF No. 172.

On appeal, Hope raised four enumerations of error: 1) her aggravated identity theft convictions should be reversed because healthcare fraud is not a qualifying predicate felony; 2) the district court plainly erred by referencing punishment when instructing the jury on the aggravated identity theft charges; 3) the Government improperly presented "wealth evidence" during her trial; and 4) the Assistant United States Attorney ("AUSA") committed misconduct during closing arguments. United States v. Hope, 608 F. App'x 831, 835 (11th Cir. 2015). The Eleventh Circuit Court of Appeals rejected each of Hope's arguments in turn and affirmed Hope's convictions and sentences. Id. at 833.

Hope timely filed her Section 2255 Motion on December 1, 2015. (Doc. 1.) Hope levies several allegations that her trial counsel, Mr. Wetzler, provided ineffective assistance. First, Hope asserts that Mr. Wetzler failed to conduct a proper investigation of the evidence in her case. (Id. at p. 2.) Next, Hope asserts Mr. Wetzler failed to voice more than one objection

3

during the entirety of her five-day trial. (Id. at p. 9.) Finally, Hope maintains Mr. Wetzler failed "to call, secure[,] or subpoena witnesses[,]" such as Mr. Withers and her bankruptcy attorney, Paul Schofield. (Id. at p. 13.)

The Government responds that the majority of Hope's contentions regarding counsel's alleged failure to investigate the evidence actually speaks to the sufficiency of the evidence used to convict her and not her counsel's assistance. (Doc. 6, p. 31.) As to the remaining portions of Hope's claims of ineffective assistance of counsel, the Government states Hope cannot meet the deficient performance and prejudice standard applicable to such claims.

The Court addresses the parties' contentions in turn.

## DISCUSSION

### I. Hope's Ineffective Assistance of Counsel Claims

Criminal defendants have a right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate (1) her counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness, and (2) she suffered prejudice as a result of that deficient performance. Id. at 685–86. The deficient performance requirement concerns "whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." Hill v. Lockhart, 474 U.S. 52, 56 (1985). There is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance. Davis v. United States, 404 F. App'x 336, 337 (11th Cir. 2010) (citing Strickland, 466 U.S. at 686). "It is petitioner's burden to 'establish that counsel preformed outside the wide range of reasonable professional assistance' by making 'errors so serious that [counsel] failed to function as the kind of counsel guaranteed by the Sixth Amendment.'" LeCroy v. United States, 739 F.3d 1297,

1312 (11th Cir. 2014) (quoting Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004) (alteration in original)). "In evaluating performance, 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" Id. (quoting Strickland, 466 U.S. at 690). "If a petitioner cannot satisfy one prong, we need not review the other prong." Duhart v. United States, 556 F. App'x 897, 898 (11th Cir. 2014). "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690.

"Showing prejudice requires petitioner to establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." LeCroy, 739 F.3d at 1312 (internal citation omitted). "The prejudice prong requires a petitioner to demonstrate that seriously deficient performance of [her] attorney prejudiced the defense." Id. at 1312–13. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011).

### A. Counsel's Failure to Investigate the Evidence

Hope maintains that, had Mr. Wetzler properly investigated the evidence in her case, he would have been able to establish many things. Included in this list is Hope's contention that the prosecutor failed to mention the rules and regulations contained in the Georgia Children Intervention Services ("CIS") manual "in comparison to the defendant committing" healthcare fraud. (Doc. 1-1, p. 2.) According to Hope, she was required to use only the reimbursement methodology contained in the CIS manual, which stated that one evaluation of a child a year equaled three visits or billing units. (Id. at p. 3.) Hope avers the CIS manual allowed a provider to give nutrition services in a child care setting or a community setting, and that she was the only

5

provider who visited patients in their communities. In fact, Hope contends she was visiting a patient on the day FBI agents arrived at her office. Additionally, Hope avers that, even though the Government stated she created fictitious medical records and never saw one patient, there were "thousand[s of] records" with patients' names being stored in a warehouse. (Id. at p. 2.) Further, Hope alleges she trained Tonya Hope in the nutrition field for a year, and that no law prohibited Tonya Hope from using the title "nutritionist" on the lab coat she wore. (Id. at pp. 4–5.) Hope also alleges staff performed iron testing on children only with parental consent, not at will as the Government asserted. In addition, Hope contends Dr. Davis did not need to examine any patient to approve Hope's recommendation pursuant to the CIS manual. Hope states that, if Mr. Wetzler had researched the online purchases she made, he could have refuted Rocio Sloan's testimony that Hope shopped on the internet all day. (Id. at p. 6.)

In response, the Government contends "much of Hope's support for this claim has nothing at all to do with her counsel's purported failure to investigate." (Doc. 6, p. 31.) As examples of their contention, the Government cites to Hope: criticizing the Government's opening statement for neglecting to mention certain rules and regulations of Medicaid; disagreeing with the comparison between Hope and other nutritional providers; challenging the evidence and testimony of Tonya Hope and Emily Keith; challenging evidence about the propriety of her use of signature stamps on medical records; and essentially blaming the Care Management Organizations ("CMOs") for the problems uncovered at Hope Nutritional Services ("HNS"). (Id.) The Government asserts these claims have nothing to do with Mr. Wetzler's alleged failure to investigate the evidence but are best characterized as a "'generalized rant about the sufficiency (the 'quality') of evidence'" used to convict her. (Id. (quoting Mincey v. Head, 2010 WL 2636022, at *3 n.4 (S.D. Ga. June 29, 2010).) The Government states Hope made

many, if not all, of these claims during cross-examination and through her own testimony, but the jury rejected these claims by finding her guilty of the charged offenses.

The Government notes that three of the claims Hope makes under the "failure to investigate" rubric do not fall under a sufficiency of evidence category, but these claims are without merit nonetheless. Specifically, evidence that Hope was at a Head Start Center during the execution of the search warrants at HNS would have been of little probative value because the overwhelming evidence at trial was that Hope billed for millions of dollars in services that were not provided as billed. (Id. at p. 33.) Additionally, the Government avers that the unrebutted testimony at trial was that the people performing the iron testing had little to no medical background. Further, the Government asserts that Hope's statement that another attorney opined Mr. Wetzler was doing very little work on her case is unsupported and is based on the alleged opinion of another attorney who never interacted with Mr. Wetzler. (Id. at p. 34.)

As noted above, this Court appointed new counsel to Hope between the trial of this case and her sentencing. Ms. Copeland represented Hope during sentencing and on appeal. Although Hope need not have claimed on appeal that Mr. Wetzler rendered ineffective assistance of counsel throughout the course of her trial, she could have challenged the sufficiency of the evidence used to convict her and did not do so. Thus, Hope should be barred from bringing a sufficiency of the evidence claim via her Section 2255 Motion. United States v. Jenkins, 604 F. App'x 744, 745 (11th Cir. 2015) (finding the district court "correctly recognized that a § 2255 motion may not assert a claim" if "it could have been raised on appeal, failure to do so was not the product of cause and prejudice, and no miscarriage will occur if it is not addressed under § 2255[ ]") (citing United States v. Allen, 16 F.3d 377, 378 (10th Cir. 1994)). In fact, the

Eleventh Circuit noted in its decision that "Hope does not argue that the evidence of her guilt was weak or insubstantial." Hope, 608 F. App'x at 842.

Even if the Court were to accept Hope's contentions in this regard not as "sufficiency of the evidence claims" but as ineffective assistance of counsel claims (establishing cause for her failure to raise the issue on appeal), Hope cannot meet her burden of establishing deficient performance by Mr. Wetzler and resulting prejudice under Strickland. The Government had many witnesses testify on its behalf in an attempt to establish Hope's guilt of the charged offenses, including Medicaid fraud investigators, the case agent, several of Hope's former employees, parents of children in the Head Start programs Hope billed, and her co-conspirator. Trial Tr., United States v. Hope, 2:13-cr-16 (S.D. Ga. May 5, 2014), ECF Nos. 155–159.[2] Mr. Wetzler cross-examined nearly every Government witness, and he questioned witnesses about several items, including the CIS manual, whether the investigators considered if Hope could have traveled from Brunswick to Atlanta to render services, and whether there was any information that Drs. Davis and Grubb had not given Hope permission to use their information and signatures. Trial Tr., United States v. Hope, 2:13-cr-16 (S.D. Ga. May 5, 2014), ECF No. 155, pp. 50, 71, 132, 144, 203; ECF No. 156, pp. 84, 88, 92, 131, 133, 137–38, 229; ECF No. 157, pp. 83–84, 89, 321; and ECF No. 158, pp. 88–90, 96, 102, 123. Further, Mr. Wetzler thoroughly cross-examined Arlene Murrell, Hope's co-conspirator, and attempted to discredit her testimony. Trial Tr., United States v. Hope, (S.D. Ga. May 5, 2014), ECF No. 228–42. Thus, Mr. Wetzler cannot be said to have performed deficiently.

---

[2] The Court has reviewed the trial transcripts, which consist of five "volumes" upon the docket and record of Hope's criminal case. The Court need not recount the testimony of every witness, as doing so would be burdensome and repetitive. However, the Court will cite to relevant portions of the witnesses' testimony, as necessary to reach its conclusions.

8

Even Mr. Wetzler had performed deficiently, Hope fails to show that she was prejudiced as a result of any alleged deficient performance pursuant to Strickland.

The Eleventh Circuit summarized the charges against Hope, as follows:

[B]eginning in January 2005 and continuing through 2011, Hope stole approximately $4 million from Medicaid by submitting thousands of phony claims for nutrition services that were not provided, not provided as billed, or not medically necessary, and that were not entitled to Medicaid reimbursement. Hope was a licensed dietician who owned Hope Nutritional Services, LLC (HNS), which purported to provide nutrition services and counseling for children enrolled in Head Start through the state of Georgia. Head Start is a government-funded program that provides services to low-income children up to five years old, the majority of whom were recipients under the Georgia Medical Assistance Program (Medicaid). Medicaid covers certain nutritional counseling services ordered by a physician or provided by a licensed dietician.

In broad terms, the [S]uperseding [I]ndictment alleged the nature of the health-care fraud scheme as follows. Hope obtained a Medicaid provider number, hired medical doctors with no background in treating children to serve as 'medical directors' of HNS, and contracted with Head Start centers in order to obtain a list of children enrolled in the centers along with their Medicaid numbers. Using the Medicaid numbers, Hope submitted false claims to Medicaid for services that were not provided. To avoid detection, Hope and others created false documentation to reflect the purported services by, for instance, using 'signature stamps' to make it look as if a doctor had prescribed the services. When the fraud began to be detected, she recruited a co-conspirator, Arlene Murrell, to, *inter alia*, continue to submit false claims under Murrell's Medicaid provider number. When Murrell received Medicaid reimbursement checks, she issued checks to HNS that corresponded to approximately 80% of the Medicaid checks' value. Hope also submitted false claims for nutrition services under the name of another licensed dietician, Marissa Garcia, without her permission.

Hope, 608 F. App'x at 833. The Eleventh Circuit determined "the evidence" "presented at Hope's five-day trial[ ]" "was consistent with the [S]uperseding [I]ndictment." Id. at 834. The Eleventh Circuit then summarized what this evidence revealed:

HNS employees traveled to Head Start centers throughout the state of Georgia to weigh and measure children and test their hemoglobin levels by pricking their fingers for blood. The HNS employees did not have any training for this work apart from taking an online course. At the Head Start centers, HNS employees received a list of the children's Medicaid information for billing. The Head Start director testified that Head Start was not supposed to give out children's Medicaid

9

information. At Hope's direction, HNS employees prepared 'cookie-cutter' documentation concerning each child, including nearly identical prescriptions, nutritional assessments, nutritional counseling notes, and physician plans of care. The HNS employees who testified at trial indicated that they did not see Hope provide any nutritional counseling to children. Nonetheless, Hope directed her employees to affix her signature to the records. In addition, Hope directed HNS employees to use a doctor's signature stamp on patient forms, and employees also used blank prescriptions and plans of care, which were pre-signed by doctors without their authorization. On follow-up visits to the Head Start centers, Tonya Hope, the defendant's sister-in-law, purportedly provided nutritional counseling. At Hope's direction, Tonya falsely identified herself as a "nutritionist" by signing her name as such and occasionally wearing a lab coat. Tonya was neither a nutritionist nor a registered dietician. Tonya testified that she, and not Hope, provided the nutritional counseling, although the relevant patient forms were signed with Hope's signature. The government also presented evidence that Hope billed for services provided on days when she was on vacation. Hope directed employees at HNS to file a certain number of Medicaid claims per day. Early on, employees were supposed to bill only fifty patients per day. Later, however, Hope sent an intraoffice memorandum telling employees to submit 100 claims per day. Rocio Sloan, who was employed at HNS for approximately eight years, testified that Hope directed Sloan and others to submit claims to Medicaid, regularly held meetings about billing, and tracked the number of claims submitted to Medicaid each day. Several parents and guardians of Head Start children testified. They generally stated that they were not aware of any nutritional problems with their children, never took their children to a physician for a nutritional consultation, and did not fill out any forms regarding a nutritional assessment.

Id.

Given the Eleventh Circuit's summation of the charges alleged in the Superseding Indictment and that Court's finding that the evidence presented during trial was consistent with the charges, Hope cannot successfully maintain that, had Mr. Wetzler "properly investigated" the evidence, the jury would have acquitted her on some or all of the charges. Accordingly, Hope has not satisfied her burden under Strickland to establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Therefore, she is not entitled to her requested relief.

**B.      Counsel's Failure to Object During Pre-Trial Hearings and at Trial**

Hope asserts Mr. Wetzler voiced only one objection during the five-day trial and did not object at all during any of the pre-trial proceedings. (Doc. 1-1, p. 9.) Hope contends Mr. Wetzler failed to object to: the additional Counts against her contained in the Superseding Indictment; the "improper suggestions" and "insinuations" in the Government's closing arguments; the Government's assertion she hired staff with no medical background or training; Tracy Hall's statement that she never saw Hope provide nutrition information or counseling; remarks concerning a licensed dietitian being the only personnel who could bill Medicaid or a CMO for nutrition counseling; and Denise Colson's testimony portraying Hope as someone who neglected patients and spent large amounts on vacations and luxury items. (Id. at pp. 9–13.)

The Government states Mr. Wetzler cannot be ineffective for failing to raise objections to non-meritorious issues. The Government notes Hope fails to identify any basis for objecting to the addition of Counts in the Superseding Indictment, which is unsurprising since there was no meritorious basis for any objection. As for objecting during the Government's closing argument, the Government avers Hope already raised this issue on appeal, and the Eleventh Circuit rejected it. The Government maintains Hope attacked the testimony of its witnesses through cross-examination and through her own testimony during the trial of this case, and her attorney cannot be said to be deficient for failing to make non-meritorious objections. (Id. at pp. 36–37.)

Mr. Wetzler cross-examined almost every Government witness, as noted in the preceding subsection of this Report, and he presented a defense during the trial of this case and during pre-trial proceedings. Mr. Wetzler did not need to object to certain questions or answers during direct examination, and Hope does not raise any meritorious objections that Wetzler failed to lodge. Further, Hope has not demonstrated that any objections Mr. Wetzler may have lodged

beyond those of record would have been sustained or would have otherwise changed the minds of the jurors.  Consequently, Hope cannot show that, even if Mr. Wetzler performed deficiently by failing to object more than he did during the proceedings before the Court, she suffered prejudice as a result.  In fact, Hope testified in her own behalf during the trial of this case, and she attempted to refute many of the things to which the Government's witnesses testified.  Trial Tr., United States v. Hope, (S.D. Ga. May 5, 2014), ECF No. 158, pp. 223–302.  However, given the jury's rather quick resolution and finding of Hope's guilt as to each and every Count of the Superseding Indictment, the jury did not find Hope's testimony more credible than the testimony provided by the Government's witnesses.

In addition, Hope raised on appeal her contention that the AUSA made four improper comments during his closing argument to the jury.  These four comments were: 1) discussing the number of children Hope billed for on September 11, 2006, and stating it made him sick to think about September 11th and remembering that date for Hope's actions; 2) untrained HNS employees "stabbing" little kids to obtain hemoglobin measurements; 3) commenting on Marissa Garcia's honesty; and 4) quoting one of the Ten Commandments in his rebuttal argument.  Hope, 608 F. App'x at 840.  While the Eleventh Circuit agreed that the AUSA's closing argument "contained some clearly improper statements[,]" id., the Court stated the AUSA's improper comments alone did not entitle Hope to relief.  Instead, the Eleventh Circuit found Hope "must show prejudice to her substantial rights[,]" "in the context of the entire trial," which "[s]he [did not do] for several reasons."  Id.

First, the Eleventh Circuit noted the improper comments were isolated and not connected with any other improper comments.  Second, the Eleventh Circuit found the district court gave curative instructions by advising the jurors anything the lawyers said was not evidence and that

they must not be influenced by sympathy for or bias against either party. "Third, and most significantly, the government convincingly established Hope's guilt by admissible, inculpatory evidence, the vast majority of which is uncontested by Hope and unrelated to the errors raised." Id. at p. 842.

Hope raised the AUSA's comments during closing argument as a contention on appeal, and the Eleventh Circuit rejected her claims. Accordingly, this Court need not address that claim because a district court is not required to reconsider claims of error that were raised and disposed of on direct appeal. Stoufflet v. United States, 757 F.3d 1236, 1239 (11th Cir. 2014) (citing United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000)). Once a matter has been decided adversely to a defendant on direct appeal, it cannot be re-litigated in a collateral attack under Section 2255, unless there has been an intervening change in the law. Nyhuis, 211 F.3d at 1343; Davis v. United States, 417 U.S. 333, 342 (1974). As the Seventh Circuit Court of Appeals has noted, "[W]e do not see how a federal prisoner—who must file [her] motion for relief under 2255 in the very court that convicted [her]—can be allowed to do so if all [s]he is doing is rehashing a claim that had been rejected on the direct appeal." White v. United States, 371 F.3d 900, 902 (7th Cir. 2004).

Moreover, even if Hope could resurrect her arguments on this front by casting them as claims of ineffective assistance of counsel, the Court should still reject her claims. As the Eleventh Circuit held, given the isolated nature of the AUSA's arguments, this Court's curative instructions, and the overwhelming evidence against Hope, she cannot demonstrate that the AUSA's improper arguments or her counsel's failure to object to them prejudiced her case.

For all of these reasons, Hope is not entitled to her requested relief on this ground.

### C. Counsel's Failure to Subpoena Witnesses

Hope avers Mr. Wetzler failed to call, secure, or subpoena four (4) specific witnesses. Hope contends Mr. Wetzler should have called Dorothy Smith, owner of a medical billing company in Atlanta, Georgia, as a witness, who would have testified that Rocio Sloan made "major errors in medical billing." (Doc. 1-1, p. 13.) According to Hope, Ms. Smith also would have testified that Hope tried to correct the medical billing problems, but the problems were too widespread to have been corrected. Hope asserts Mr. Wetzler should also have called Mr. Withers, her former attorney, to testify during the trial of her case. Hope submits that Mr. Withers completed a thorough investigation of HNS' medical billing department, met with Ms. Smith and her staff concerning HNS' medical billing department, discovered the CMOs issued Hope a physician's contract, and met with the Amerigroup CEO. Additionally, Hope alleges Paul Schofield, a local bankruptcy attorney, could have testified concerning Hope's financial status and spending habits. (Id. at p. 14.) Finally, Hope asserts the manager at the Georgia Employment Office in Brunswick, Georgia, could have testified that Darlene McGirth abandoned her job during a fraud investigation audit and lied in order to obtain unemployment benefits. (Id. at p. 14.)

According to the Government, the decision to call certain witnesses and not others is the epitome of strategic decision-making under Strickland. The Government contends Ms. Smith's speculative testimony would have bolstered its evidence against Hope. The Government also contends Mr. Withers and Mr. Schofield could not have testified as to anything of evidentiary value without waiving attorney-client privilege. Even if Mr. Withers had been allowed to testify, the Government asserts he had no personal knowledge of the fraud at HNS. Additionally, the Government states, had Mr. Schofield testified, any testimony he provided regarding Hope's

14

spending habits and financial condition would have corroborated the Government's evidence. The Government declares that the manager of Georgia Employment Office could not testify as to a specific instance of untruthfulness by Darlene McGirth under Rule 608(b) of the Federal Rules of Evidence.

In addition to these reasons provided by the Government, Hope's own testimony demonstrates the futility of her line of reasoning. Hope herself testified as to the billing errors she encountered, such as her billers using nutritional therapy codes but the CMOs rejecting these codes, and that her billers inadvertently pre-billed for services later rendered or mistakenly billed when Hope was on vacation. Trial Tr., United States v. Hope, 2:13-cr-16 (S.D. Ga. May 5, 2014), ECF No. 158, pp. 223, 259, 288. Hope also testified that Mr. Withers informed her that she had been given a physician's contract for billing by the CMOs. Id. at p. 232. Moreover, Hope testified that she put every dime she made back into her company and even reimbursed the company for her expenditures since she could borrow money from her corporation based on its incorporation status. Id. at pp. 226, 231, 277, 286. Mr. Wetzler stated during his closing argument that Hope was living in her car and did not have the proverbial pot in which to urinate. Trial Tr., United States v. Hope, 2:13-cr-16 (S.D. Ga. May 5, 2014), ECF No. 159, pp. 60, 66. Finally, Hope declared that she heard her former employees testify, and "some of them didn't tell the truth." Trial Tr., United States v. Hope, 2:13-cr-16 (S.D. Ga. May 5, 2014), ECF No. 158, p. 294. When the AUSA asked Hope to clarify whether she meant the former employees were lying on the witness stand, Hope replied, "Some of them did, yes." Id. at pp. 294–95.

Mr. Wetzler cannot be said to have performed deficiently by making a strategic decision not to call three witnesses (Ms. Smith, Mr. Withers, and Mr. Schofield) to provide cumulative and repetitive testimony. Even if Mr. Wetzler had performed deficiently on this front, as Hope

contends, she fails to establish she was prejudiced by any alleged deficient performance. It bears repeating that, after a five-day trial with nearly fifty witnesses and a large volume of exhibits, the jury took less than three hours to return a verdict of guilty on all fifty-plus counts of the Superseding Indictment. As noted above, Hope testified to the matters on which she claims these witnesses could have provided testimony. The jury did not find Hope's testimony compelling, and she cannot claim that, but for her counsel's failure to call these three witnesses, she would have been acquitted on some or all of the charges set forth in the Superseding Indictment.

In addition, Hope testified that some of her former employees who testified during the trial of this case had lied on the witness stand and under oath, and Ms. McGirth may have very well been included in Hope's testimony. Assuming, *arguendo*, that Mr. Wetzler had questioned Ms. McGirth about having lied to obtain unemployment benefits, the AUSA would have objected to this questioning, and Judge Wood would have likely sustained that objection. Fed. R. Evid. 608(b) ("[E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.").

In sum, Hope did not set forth errors that were "so serious" that Mr. Wetzler can be said to have "failed to function as counsel guaranteed by the Sixth Amendment." LeCroy, 739 F.3d at 1312. Hope has not shown, but for Mr. Wetzler's alleged ineffective assistance, the outcome of her trial would have been different, i.e., that the jury would have acquitted her on some or all of the Counts of the Superseding Indictment. The likelihood of an acquittal (or any outcome other than guilty on all Counts) has to be "substantial" and not just "conceivable". Harrington, 562 U.S. at 112. Consequently, Hope cannot overcome her burden of establishing both prongs of the Strickland standard, and she is not entitled to her requested relief.

## II. Leave to Appeal *in Forma Pauperis* and Certificate of Appealability

The Court should also deny Hope leave to appeal *in forma pauperis*. Though Hope has, of course, not yet filed a notice of appeal, it would be appropriate to address this issue in the Court's order of dismissal. Fed. R. App. P. 24(a)(3) (trial court may certify that appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed"). An appeal cannot be taken *in forma pauperis* if the trial court certifies that the appeal is not taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3). Good faith in this context must be judged by an objective standard. Busch v. Cty. of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999). A party does not proceed in good faith when she seeks to advance a frivolous claim or argument. See Coppedge v. United States, 369 U.S. 438, 445 (1962). A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless. Neitzke v. Williams, 490 U.S. 319, 327 (1989); Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993). Stated another way, an *in forma pauperis* action is frivolous and, thus, not brought in good faith, if it is "without arguable merit either in law or fact." Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002); see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Additionally, under 28 U.S.C. § 2253(c)(1), an appeal cannot be taken from a final order in a habeas proceeding unless a certificate of appealability is issued. Further, under Rule 11 of the Rules Governing Section 2255 Proceedings, the Court must issue or deny a certificate of appealability when entering an order adverse to the applicant. A certificate of appealability may issue only if the applicant makes a substantial showing of a denial of a constitutional right. The decision to issue a certificate of appealability requires "an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336

(2003). In order to obtain a certificate of appealability, a petitioner must show "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Id. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also Franklin v. Hightower, 215 F.3d 1196, 1199 (11th Cir. 2000). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." Miller-El, 537 U.S. at 336.

Based on the above analysis of Hope's Motion and the Government's Response and applying the Certificate of Appealability standards set forth above, there are no discernable issues worthy of a certificate of appeal; therefore, the Court should **DENY** the issuance of a Certificate of Appealability. If the Court adopts this recommendation and denies Hope a Certificate of Appealability, Hope is advised that she "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." Rule 11(a), Rules Governing Section 2255 Cases in the United States District Courts. Furthermore, as there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, the Court should likewise **DENY** *in forma pauperis* status on appeal.

## CONCLUSION

Based on the foregoing, I **RECOMMEND** that the Court **DENY** Hope's Motion, **DIRECT** the Clerk of Court to **CLOSE** this case, **DENY** Hope *in forma pauperis* status on appeal, and **DENY** Hope a Certificate of Appealability.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within **fourteen (14) days** of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the pleading must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Court **DIRECTS t**he Clerk of Court is to serve a copy of this Report and Recommendation upon Hope and Respondent.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 14th day of November, 2016.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA