**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR 213-016** |
| | ) | |
| **SCHELLA HOPE** | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO AMEND HER MOTION FOR COMPASSIONATE RELEASE**

Defendant Schella Hope moves to amend her original motion for compassionate release based upon the COVID-19 pandemic.  (Doc. 212.)  However, Hope fails to establish that she has first exhausted her administrative remedies as to her COVID-19 claim.  Further, Hope continues to fail to allege any qualifying medical condition, as required under U.S.S.G. § 1B1.13, supporting an extraordinary and compelling reason justifying release.  Therefore, the United States respectfully requests that this Court deny Hope's motion.

## Factual Background

In September 2013, the grand jury returned a 59-count superseding indictment charging Hope with various health care fraud, money laundering, and aggravated identity theft violations.  (PSR ¶ 3.)  At trial, a jury convicted Hope of all remaining counts.[1]  (PSR ¶ 4.)  Although the court granted Hope bond after the jury's guilty verdicts, it subsequently revoked her bond due to a violation.  (PSR ¶ 5.)

The presentence investigation report (PSR) calculated that, based on Hope's

---

[1] On the first day of trial, the government dismissed Count 55.  (PSR ¶ 4.)

fraudulent Medicaid billing activities, the total financial loss attributable to her health care fraud was over $4.3 million.  (PSR ¶ 27.)  The PSR assessed a total offense level of 40.  (PSR ¶ 40.)  This included a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 because she testified falsely at trial and also attempted to  threaten or intimidate one of the witnesses from her trial.  (PSR ¶¶ 33-34, 48, 57.) She also received a two-level enhancement under U.S.S.G. § 3A1.1(b)(1) because her health care fraud involved vulnerable victims.  (PSR ¶ 46.)  With a criminal history category I, Hope's advisory guidelines range was 292 to 365 months' imprisonment, plus another 24 months' imprisonment consecutive on the aggravated identity theft convictions.  (PSR ¶ 94.)  On May 19, 2014, the district court varied downward, sentencing Hope to a total of 192 months' imprisonment, with over $4.3 million in restitution.  (Doc. 170.)

Hope's convictions and sentences were affirmed on appeal.  *See United States v. Hope*, 608 F. App'x 831 (11th Cir. 2015).  Subsequently, Hope moved to vacate her convictions under 28 U.S.C. § 2255, but was denied by the district court.  *See Hope v. United States*, No. CV 215-169, 2017 WL 105720 (S.D. Ga. Jan. 10, 2017) (adopting magistrate court's report and recommendation, 2016 WL 6699147 (S.D. Ga. Nov. 16, 2016)).  In August 2018, Hope requested that this Court allow her to be placed on home confinement or probation.  (Doc. 206.)  In support, she alleged many of the same physical ailments she complains about in her present motion.  (Doc. 206.)  The district court denied her motion, explaining that "[t]hese issues were taken into consideration at the time the Court imposed her sentence of 192 months, which was below the

recommended Sentencing Guideline range . . . ."  (Doc. 208.)

Hope originally moved for compassionate release in February 2020.  (Doc. 209.) While she exhausted her administrative remedies prior to filing that motion, her original requests to BOP were not based on COVID-19.  (Doc. 209.)  The United States opposed her motion. (Doc. 210.)  Hope's original motion remains pending.  She now moves to amend her original motion to include the COVID-19 pandemic as a justification for her early release.  (Doc. 212.)

Hope is currently incarcerated at Carswell FMC located in Fort Worth, Texas with a projected release date of August 22, 2027.[2]

## Legal Analysis

### A.  Statutory Background

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without

---

2 BOP Inmate Locator, *available at* https://www.bop.gov/inmateloc/ (last visited May 11, 2020).  Projected release date indicates release from BOP custody and may not reflect date by which BOP will consider defendant for placement in a halfway house, a residential reentry center or home confinement.

conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)  extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides:  "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States*, 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive Guidelines amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[3]

---

[3] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate herself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2)

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. *See United States v. Wilkes*, 464 F.3d 1240, 1245 (11th Cir. 2006) ("Commentary and Application Notes of the Sentencing Guidelines are binding on the courts unless they contradict the plain meaning of the text of the Guidelines." (internal quotation marks omitted)). The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)    Medical Condition of the Defendant.—
>
> (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii)    The defendant is—
>
> (I)    suffering from a serious physical or medical condition,

---

regarding the imposition of a sentencing modification).

(II)     suffering from a serious functional or cognitive impairment, or

(III)    experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)     Family Circumstances.—

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)     Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

For its part, consistent with note 1(D), BOP promulgated Program Statement 5050.50,[4] available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf, amended effective January 17, 2019, to set forth its evaluation criteria.

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See United States v. Saldana*, — F. App'x —, 2020 WL 1486892, at *4 (10th Cir. 2020) ("[O]ur cases require the movant to show that §

---

[4] Hereafter referred to as "PS 5050.50."

3582(c) authorizes relief for the court to have jurisdiction."); *see also United States v. Heromin*, No. 11-550, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (citing *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013)). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *See United States v. Willis*, No. 15-3764, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

### B. BOP's response to the COVID-19 pandemic.

For the benefit of the Court, an initial statement regarding the COVID-19 situation is warranted. Putting aside the ultimate untimeliness of Hope's motion to amend, the Government is certainly sensitive to the issues presented by the COVID-19 pandemic, and, along with BOP, is monitoring the situation constantly. The Government does not minimize the concern or the risk. BOP has taken aggressive action to mitigate the danger and is taking careful steps to protect inmates' and BOP staff members' health. As the situation changes, BOP will continue take action to attempt to protect all inmates and staff members, including those who may be more susceptible to adverse results due to age and existing ailments. Inmates will receive equal and fair consideration based on their facility, health concerns, and other applicable factors as the situation evolves.

BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization (WHO).

On March 13, 2020, BOP announced that it was implementing the Coronavirus (COVID-19) Phase Two Action Plan ("Action Plan") in order to minimize the risk of COVID-19 transmission into and inside its facilities. The Action Plan comprises several preventive and mitigation measures, including screening staff and all new BOP inmates and quarantining where appropriate; suspending volunteer access; restricting contractor access to BOP facilities except for essential services; assessing stockpiles of food, medicine and sanitation supplies; establishing quarantine areas; placing a 30-day hold on all social visits but increasing detainees' telephone allowance to 500 minutes per month; placing a 30-day hold on legal visits except on a case-by-case basis where the attorney will be first screened for infection; stopping  of inmates between facilities for at least 30 days (exceptions for medical treatment and other exigencies); canceling staff travel and training; and requiring wardens at BOP facilities to modify operations to maximize social distancing, such as staggering meal and recreation times.

On March 18, 2020, the BOP implemented Phase Three Action Plan for locations that perform administrative services, which followed Department of Justice (DOJ), Office of Management and Budget (OMB) and Office of Personnel Management (OPM). On March 26, 2020, the BOP implemented Phase Four Action Plan, which revised preventive measures for all institutions by updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. These procedures apply to all new intakes,

detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival. In addition, asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

Effective April 1, 2020, BOP implemented Phase Five Action Plan in response to a growing number of quarantine and isolation cases, to further mitigate the risk of exposure and spread of COVID-19.  Phase Five provides that: (1) for a 14-day period, inmates in every institution were secured in their assigned cells/quarters to decrease the spread of the virus based on health concerns; and (2) BOP would coordinate with the United States Marshals Service (USMS) to significantly decrease incoming movement.[5]  On April 13, 2020, the Director of BOP ordered the implementation of Phase 6, which extended all measures from Phase 5 until May 18, 2020. On April 23, 2020, BOP announced that they recently received additional equipment allowing them to expand COVID-19 testing, which BOP was prioritizing at select facilities experiencing widespread transmission.  On May 7, 2020, BOP announced that it was substantially expanding its testing, starting with detention and quarantine sites, using new equipment provided by the U.S. Department of Health and Human Services.

---

[5]   Further details regarding these efforts are available at: https://www.bop.gov/resources/news/20200313_covid-19.jsp and at a regularly updated resource page: https://www.bop.gov/coronavirus/index.jsp.

In addition, on March 26, 2020, the Attorney General directed the Director of BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Further, Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted on March 27, 2020, permits BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate." On April 3, 2020, the Attorney General issued a memorandum directing BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and at other similarly situated BOP facilities where COVID-19 is materially affecting operations." *See* Memorandum from the Attorney General to the Director of the Bureau of Prisons (Apr. 3, 2020), *available at* https://www.justice.gov/file/1266661/download (last visited Apr. 6, 2020). As a result, BOP implemented the Attorney General's directive. *See* Update on COVID-19 and Home Confinement: BOP continuing to aggressively screen potential inmates, *available at* https://www.bop.gov/resources/news/20200405_covid19_home_

confinement.jsp (last visited Apr. 13, 2020). BOP has increased home confinement by over 40 percent since March and has further increased its screening under the Attorney General's memo. *See id*. As part of this process, BOP is screening and reviewing all inmates automatically to determine which ones meet the criteria established by the Attorney General, meaning prisoners do not have to apply to be considered for home confinement. *See id*. Based on the Attorney General's directive, BOP has placed an additional 2,431 inmates on home confinement so far, representing an increase of 86.1 percent.[6] *See* https://www.bop.gov/coronavirus/index.jsp (last visited May 11, 2020).

Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution, and reflect a careful, evidence-based approach that not only provides an overall strategy, but also allows BOP to respond to the specific challenges faced by particular facilities and inmates. BOP professionals will continue to monitor this situation and adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders. Accordingly, the Government does not advocate action by judges in individual cases that do not involve immediate risk to that particular inmate.

---

[6] As of May 11, 2020, 3,379 inmates and 250 BOP staff members nationwide have tested positive. BOP COVID-19 resource page, *available at* https://www.bop.gov/coronavirus/index.jsp (last visited May 11, 2020). Additionally, 656 inmates and 279 staff members have recovered. *See id*. BOP has reported 49 COVID-19 related deaths nationwide. *See id*.

### C. Hope has not demonstrated that she first exhausted her administrative remedies.

#### 1. Hope does not demonstrate that she attempted to exhaust her administrative remedies in regards to her COVID-19 claim.

In this case, Hope's request to amend should be dismissed because she has not established that she fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on her behalf, or that 30 days have lapsed from the receipt of such a request by the warden of Hope's facility—based on the COVID-19 pandemic. The risk that COVID-19 presents generally is well acknowledged, but BOP has an effective administrative process in place to determine how best to respond to the risk each individual inmate faces.   Just like any other situation, the exhaustion requirement allows BOP to apply that process in a timely, professional, orderly and fair manner, without giving preferential treatment to inmates who prematurely rush to the courts.  As discussed below, courts have already emphasized the requirement for inmates to go through the BOP process first before seeking judicial remedies.

Although Hope did exhaust her administrative remedies as to her original request, she cannot piggyback this new COVID-19 claim onto her original motion and, thus, sidestep the requirement of § 3582(c)(1)(B).  *See United States v. Mollica*, No. 14-329, 2020 WL 1914956, at *6 (N.D. Ala. Apr. 20, 2020) ("While Ms. Mollica properly pursued administrative relief before she filed her first motion for compassionate release based on her transabdominal mesh and fibroid, she has provided no indication that she exhausted her administrative remedies regarding her complaint about COVID-19.  Therefore, she cannot properly bring her motion to this

court.").  As to the COVID-19 claim, Hope has not shown that the warden ultimately denied her request, that she exhausted her administrative appellate remedies or that 30 days passed since submitting her compassionate release request to BOP.  As a result, Hope has not shown, as is her burden, that she submitted a valid administrative request triggering the statutory 30-day deadline, let alone fully exhausted her administrative remedies.  *See United States v. Currie*, No. CR 107-077, 2020 U.S. Dist. LEXIS 70148, at *1 (S.D. Ga. Apr. 21, 2020) ("The Court finds that Currie has not *fully* exhausted his administrative remedies because he failed to respond to the BOP's request for additional information to support his claim." (citing *United States v. Howard*, No. 4:15-CR-00018-BR, 2019 WL 7041860, at *3 (E.D.N.C. Dec. 20, 2019))); *see also United States v. Harris*, No. 12-140, 2020 WL 1969951, at *1 (M.D. Fla. Apr. 24, 2020) ("Even if Harris submitted the document, he did not provide the Warden with the required minimum information like where he will live, how he will support himself, where he will receive medical treatment, and how he will pay for treatment if released.").

Because Hope failed to meet her burden demonstrating that she has exhausted her administrative remedies for her COVID-19 claim as required under 18 U.S.C. § 3582(c)(1)(A), this Court currently is without jurisdiction and must dismiss her motion to amend. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("As noted, Raia failed to comply with § 3582(c)(1)(A)'s exhaustion requirement: BOP has not had thirty days to consider Raia's request to move for compassionate release on his behalf, and there has been no adverse decision by BOP for Raia to

administratively exhaust within that time period . . . ."); *see also United States v. Dowlings*, No. CR 413-171, 2019 WL 4803280, at *1 (S.D. Ga. Sept. 30, 2019) ("Defendant has not shown that he requested compassionate release from the Bureau of Prisons or exhausted his administrative remedies."); *United States v. Estrada Elias*, No. 06-96, 2019 WL 2193856, at *2 (E.D. Ky. May 21, 2019) ("The present motion is not brought by the Director of the Bureau of Prisons and it does not appear that Elias has exhausted his administrative remedies. . . . Accordingly, his request for compassionate release will be denied.").

In *Raia*, the defendant argued that he faced a "heightened risk of serious illness or death from the [COVID-19] virus" because he was 68-years old and suffered from Parkinson's Disease, diabetes and heart problems. *See Raia*, 954 F.3d at 596. The Third Circuit recently explained, despite this, that it would be futile to remand the defendant's compassionate release issue back to the district court because he had not yet exhausted his administrative remedies. *See id*. at 597. As particularly relevant in this case, the Court of Appeals emphasized:

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.

*Id*. Other courts have applied similar reasoning in enforcing the exhaustion requirement and in denying motions for compassionate release based on general COVID-19 allegations. *See United States v. Pope*, No. CR 216-024, 2020 WL 1956510, at *1 (S.D. Ga. Apr. 23, 2020) (holding in COVID-19 context that because defendant

14

failed to exhaust administrative remedies the court did not have jurisdiction to decide compassionate release motion); *see also United States v. Gagne*, No. 3:18-cr-242 (VLB), 2020 WL 1640152, at *4 (D. Con. Apr. 2, 2020) (denying compassionate release motion, where defendant filed supplemental briefing on risk of complications from COVID-19, because she did not exhaust administrative remedies and did not present "information to show that her specific medical conditions, medications, and conditions of confinement at FCI Danbury are inclined to uniquely and adversely affect her to the degree sufficient to establish 'extraordinary and compelling' reasons"); *United States v. Clark*, No. 17-85-SDD-RLB, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020) (finding defendant failed to exhaust administrative remedies, failed to demonstrate extraordinary and compelling reasons for a sentence modification, and presented no evidence that BOP's plan to address the pandemic would not adequately protect inmates); *United States v. Garza*, No. 18-CR-1745-BAS, 2020 WL 1485782, at *2 (S.D. Cal. Mar. 27, 2020) (finding that "decisions as to which prisoners should be released because of the COVID-19 epidemic are better left to the [BOP] and its institutional expertise"); *United States v. Eberhart*, No. 13-cr-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13."); *United States v. Gileno*, No. 19-161, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (denying relief where defendant had not shown that BOP's plan was inadequate to manage the pandemic within his facility,

15

or that his facility was unable to adequately treat him).

2. **BOP designation of inmates to home confinement, including under the CARES Act, is effectuated under a different statute, and evaluated differently than requests for reduction-in-sentence for compassionate release.**

In her motion, Hope mentions that she believes she qualifies for home confinement under the CARES Act and the Attorney General's memoranda. (Doc. 212 at 2.) "It is important to understand that a request for home confinement under the CARES Act is different than a reduction-in-sentence (RIS) request based upon compassionate release." *See United States v. Allen*, No. CR 214-024, 2020 WL 2199626, at *1 (S.D. Ga. May 6, 2020). According to BOP legal counsel, BOP is utilizing its authority under 18 U.S.C. § 3623(c)(2) and 34 U.S.C. § 60541—not the compassionate release provision of 18 U.S.C. § 3582(c)— to effectuate the Attorney General's March 26, 2020 and April 3, 2020 memoranda. *See Allen*, 2020 WL 2199626, at *1.

Under § 3623(c)(2) and § 60541, it is BOP's responsibility to compute a prisoner's sentence, including home confinement designation. *See Gonzalez v. United States*, 959 F.2d 211, 212 (11th Cir. 1992), *abrogated on other grounds by Santiago-Lugo v. Warden*, 785 F.3d 467 (11th Cir. 2015); *Clay v. Henderson*, 524 F.2d 921, 924 (5th Cir. 1975) ("[T]he Board of Prisons, through the Attorney General, possesses the absolute authority, absent a showing of abuse of discretion, to designate the place of a prisoner's confinement and to administer transfer matters."); *see also United States v. Lovelace*, No. 12-402, 2014 WL 4446176, at *2 (N.D. Ga. Sept. 2014) ("[T]he Court has no authority to grant Defendant's request and order the Bureau of Prisons to

16

release Defendant to a halfway house." (citing 18 U.S.C. §§ 3621(b) & (b)(5))).  These statutes "do not authorize a federal court to order the BOP to release a prisoner . . . ."  *See United States v. Calderon*, — F. App'x —, 2020 WL 883084, at *1 (11th Cir. Feb. 24, 2020) (explaining that under § 60541(g)(1)(A) the Attorney General "may" release eligible elderly offenders, and district court was without jurisdiction to grant relief); *United States v. Lynn*, No. 89-72, 2019 WL 3082202, at *3 (S.D. Ala. July 15, 2019) ("Congress has made the decision whether to place a prisoner in home confinement pursuant to Section 60541(g) exclusively that of the Attorney General and BOP, not the courts.").  Thus, under those statutes, BOP can administratively determine the inmate's place of confinement—including home confinement—without seeking authority from the district court (and, in fact, the district court is precluded from doing so).  *See United States v. Mabe*, No. 15-133, 2020 U.S. Dist. LEXIS 66269, at * (E.D. Tenn. Apr. 15, 2020) ("However, the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of Prisons. . . . This Court therefore does not have the power to grant relief under Section 12003 of the CARES Act.").

On the other hand, 18 U.S.C. § 3582(c)(1)(A), U.S.S.G. § 1B1.13 & app. n. 1, and PS 5050.50 address compassionate release requests.  This statute, guideline, and program statement involve a different procedure and analysis than § 60541(g) and § 3623(c)(2).  *See, e.g., Lynn*, 2019 WL 3082202, at *3 (explaining that "Section 60541(g) addresses home confinement, not release under Section 3582(c)(1)(a)").  Importantly, as part of the compassionate-release RIS process, the inmate requests that the

Director of the BOP file a motion for compassionate release on his behalf in the district court. *See* 18 U.S.C. § 3582(c)(1)(A); PS 5050.50. Where a compassionate release request is granted by the court, "the Warden of the institution where the inmate is confined shall release the inmate forthwith." PS 5050.50 at 14 (citing 28 C.F.R. § 571.62(b)). This is why, before agreeing to an RIS, BOP requires an inmate to have a release plan, and also requires an evaluation of the risk to the community. *See id.* at 3, 12. In short, when an inmate requests an RIS based upon compassionate release, he is asking BOP to agree to file a motion on his behalf with the district court.

Here, the Court does not have the ability to place Hope in home confinement—that is left to BOP's discretion. As such, Hope has not provided evidence that she submitted a request to BOP that triggered the 30-day deadline under § 3582(c)(1)(A). Yet, even if the Court were to consider her request as a compassionate release request, she still did not exhaust the 30-day requirement required by statute. Accordingly, this Court is without jurisdiction to grant compassionate release on this basis. *See Allen*, 2020 WL 2199626, at *1 ("These statutes do not authorize a federal court to order the BOP to release a prisoner.").

### D. Hope has not established a qualifying medical condition.

Moreover, for the same reasons stated in the Government's original response (Doc. 210.) Hope has not provided evidence of a medical condition that qualifies as an "extraordinary and compelling reason" for compassionate release under § 3582(c)(1)(A) and U.S.S.G. § 1B1.13, particularly in regards to the effects of COVID-19. The statute and the Guidelines commentary make clear that compassionate

release for extraordinary and compelling reasons is limited to medical, elderly, or family circumstances. *See Saldana*, 2020 WL 1486892, at *3-*4 (where defendant argued for compassionate release based on his claim he was no longer a guidelines career offender based on new caselaw, holding court did not have jurisdiction to release because that claim did not satisfy one of the specific categories of § 3582(c)).[7] Because Hope fails to provide evidence of a qualifying medical reason or a qualifying family reason, as is her burden, this Court should dismiss her motion. *See United States v. Lotts*, No. 08-1631, 2020 WL 835298, at *4 (D.N.M. Feb. 20, 2020) ("Defendant has not submitted affidavits or medical records documenting his health conditions or additional evidence in support of his Motion. Consequently, the Court will not grant Defendant's Motion because he has not met his evidentiary burden."); *see also United States v. Alejo*, No. CR 313-009, 2020 U.S. Dist. LEXIS 35873, at *3 (S.D. Ga. Feb. 27, 2020) (explaining that while defendant attached "Administrative

---

[7] That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of "extraordinary and compelling reasons." *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified Apr. 2, 2020). Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I). But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution. Here, though, Hope has not provided evidence to meet her burden.

Notes" from his BOP record, "[t]his evidence does not indicate, however, that Alejo's medical condition currently meets the criteria set forth by the Sentencing Commission to qualify him for a reduction in sentence").

### E. Alternatively, this Court should exercise its discretion and decline to grant Hope's motion for compassionate release.

Even if this Court were to find that it has jurisdiction to consider Hope's compassionate release request (and specifically the motion to amend), it should exercise its discretion and decline to grant it. *See* 18 U.S.C. § 3582(c)(1)(A) (explaining court "may reduce the term of imprisonment"); *see also United States v. Webster*, No. 3:91CR138 (DJN), 2020 WL 618828, at *5 (E.D. Va. Feb. 10, 2020) ("Even if a defendant meets the eligibility criteria for compassionate release, the Court retains discretion over whether to grant that relief."). In making this determination, the district court must determine that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) . . . ." U.S.S.G. § 1B1.13(2). This includes considering the person's character, physical and mental condition; their past conduct; their criminal history; and whether, at the time of the offense, the person was on probation or parole. *See* 18 U.S.C. § 3142(g)(3). Moreover, the court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id*. § 3142(g)(4). Should the district court conclude the defendant does not pose a danger to any person or the community, it must then continue to evaluate the factors under § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Willingham*, No. CR 113-010, 2019 WL 6733028, at *1 (S.D. Ga. Dec. 10, 2019).

Hope has the burden to show she qualifies for compassionate release, and she has not provided any documentation demonstrating that her specific medical conditions, medications, and conditions of confinement at FMC Carswell are inclined to uniquely and adversely affect her to the point of justifying early release. Moreover, Hope has not demonstrated (as is her burden) that BOP's COVID-19 plan is inadequate or that FMC Carswell is specifically unable to adequately treat her. Presumably, as a federal medical center, FMC Carswell would be able to address Hope's medical concerns. As of May 11, 2020, FMC Carswell reported one inmate and zero staff members had testified positive for COVID-19.[8] Here, Hope is not being treated any differently than any other inmate, and she has not shown that BOP cannot adequately address any potential medical issues she faces during this period. Because Hope has not demonstrated how COVID-19 specifically affects her, apart from pure speculation, nor shown that BOP's plan is inadequate, nor established that FMC Carswell is unable to adequately treat her, her request for compassionate release based on COVID-19 fails.

---

[8] *See* BOP COVID-19 resource page.

## **Conclusion**

For the foregoing reasons, the United States respectfully requests that Defendant's request to amend her motion for compassionate release (Doc. 212) be denied.

Respectfully submitted,

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

**_//s// Justin G. Davids_**
Justin G. Davids
Assistant United States Attorney
Missouri Bar No. 57661

P.O. Box 8970
Savannah, Georgia 31412
(912) 652-4422

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") that was generated as a result of electronic filing in this Court. Additionally, a copy has been mailed to:

Schella Hope, Reg. No. 22040-017
FMC Carswell
Federal Medical Center
Inmate Legal Mail
P.O. Box 27137
Fort Worth, Texas 76127

This May 12, 2020.

Respectfully submitted,

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

*/s/ Justin G. Davids*
Justin G. Davids
Assistant United States Attorney
Missouri Bar No. 57661

Post Office Box 8970
Savannah, Georgia 31412
(912) 652-4422